[No. 30185-3-I.    Division One.    October 24, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ANTHONY P. FLORCZAK, *Defendant*, DENISE TERRELL, *Appellant*.

*Kathryn A. Miller* of *Washington Appellate Defender Association*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lisa Johnson, Deputy*, for respondent.

SCHOLFIELD, J. — Denise Terrell appeals the judgment and sentence entered against her for one count of first degree child molestation and one count of sexual exploitation of a

minor. Terrell argues that the trial court erred by admitting child hearsay statements under the medical diagnosis and treatment exception of ER 803(a)(4) and that admitting that evidence violated her right to confrontation. She also contends the trial court erred by admitting expert testimony about posttraumatic stress syndrome because the witness was not qualified as an expert, the evidence did not satisfy the reliability requirements of *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923), and the testimony constituted an impermissible opinion about Terrell's guilt. We affirm.

The following facts were presented during trial. On May 2, 1991, Seattle Police Officers Bacon and Radford stopped a car for a traffic violation. The driver gave his name as Gary Allen Raymond, but the passenger, Denise Terrell, informed Officer Radford that the man's true name was Anthony Florczak and he was wanted by the New Jersey police for a parole violation. Florczak denied he had given a false name and permitted Officer Bacon to search his wallet for additional identification showing his name was Gary Raymond.

While searching the wallet, Officer Bacon found a photograph of a nude adult woman and a nude young girl who were both kneeling and exposing their genitalia. Officer Bacon asked Terrell about the photograph, and she initially denied any knowledge about it. After additional questioning, however, Terrell admitted she was the adult in the photograph and her 3-year-old daughter, KT, was the child. According to Officer Radford, Terrell told him she lied at first about the photograph because she was worried it might affect a custody dispute she was having with KT's father, Joe Klein.

The officers verified that Florczak was a fugitive from New Jersey and arrested him. Terrell was not arrested at that time, but the police notified Child Protective Services (CPS) of the photograph.

Detective Lyon subsequently interviewed Terrell, who was living with KT at a shelter in Seattle. Terrell acknowledged again that she and her daughter were the figures in the photograph. She stated that Florczak had taken the photo as "a cute shot" and it was meant to be a joke.

CPS removed KT from Terrell's custody and placed KT with her father, Klein, and his wife, Debbie. CPS also referred the case to the Eastside Sexual Assault Center for Children and requested an opinion about whether the photograph caused any injury to KT and whether any other abuse had occurred. Molli Wilson, a master's level social worker at the center, separately interviewed Joe Klein and KT. Over the course of five sessions from May 31, 1991, through June 17, 1991, KT disclosed to Wilson that both Florczak and Terrell had sexually abused her on numerous occasions. Based on those disclosures, the State filed an amended information charging Florczak with one count of "Possession [of] Depictions of Minors in Sexually Explicit Conduct" and two counts of first degree rape of a child. The same information charged Terrell with one count of first degree rape of a child, one count of first degree child molestation, and one count of sexual exploitation of a minor.

During a pretrial child hearsay hearing, the State sought to admit Molli Wilson's testimony about KT's out-of-court statements to her under ER 803(a)(4), the medical diagnosis or treatment exception to hearsay. Defense counsel argued that the hearsay exception was not available to the State because KT was too young to understand that her statements to Wilson were necessary for diagnostic or treatment purposes and because Wilson was performing an investigative function when she interviewed KT. Defense counsel also argued that under *Idaho v. Wright*, 497 U.S. 805, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990), Terrell's and Florczak's right to confrontation would be violated by admitting KT's statements into evidence. The trial court ruled as follows:

> Well, first of all, I have examined the doctor's report and affidavit, and I am satisfied that it was indeed ongoing, the commencement, if you will, of ongoing therapy for the child; and the nature of that is I think precisely what [ER] 803(a)(4) covers.
>
> I would further find that the [ER] 803(a)(4) exception . . . is a firmly-rooted one. . . .
>
> And I do not think, as we discussed yesterday, that *Idaho* against *Wright* controls for the simple reason that it is dealing with an exception that is not firmly-rooted [the residual hear-

say exception], one that apparently came into being when the federal rules were promulgated a few years ago, and it therefore does not control. I am for that reason going to permit the state to introduce the testimony.

. . . .

. . . I think it is a firmly-rooted exception, and, therefore, there is no need to further establish reliability. It is established if it fits that exception. I think it does.

At trial, Wilson testified about her extensive training and experience as a family therapist working with abused children and emphasized that she was a therapist, not an investigator. When Wilson interviewed Klein, he told her that KT occasionally had complained that her "peepee" hurt, and on those occasions he had noticed redness in her vaginal area. Klein also described behavior problems KT had exhibited. For example, KT "had poor impulse control, aggression with toys, some sleep problems, seemed real distractible, seemed fearful, anxious, [had] stomach aches, headaches". Wilson testified that "[s]ome of those symptoms . . . could be correlated with a child who has been sexually abused".

After interviewing Klein, Wilson met with KT alone. Wilson testified that during the initial session she tried

to familiarize the child with not only myself, because it is a relationship, but the office and the toys, and to ask her . . . why she's there, to which —

. . . .

. . . [KT] responded that she didn't know. Later she indicated she had a sense it was to talk about her mother, Denise, but she was very vague.

. . . I also explain[ed] that . . . the agency is a safe place for children and that she could talk about whatever she wanted to talk about, whether it's, if she had any pets or toys or school or whatever it was, that this was what we were going to spend our time doing.

Wilson testified that after several sessions she concluded KT knew the difference between the truth and a lie and was not "suggestible". Wilson also determined that KT had not been "scripted", that is, had not been prompted by someone to make her disclosures.

During the first session, KT seemed to Wilson "very fearful, very anxious, and . . . somewhat depressed". At the

second session, Wilson told KT she knew about the photograph, and KT became very frightened and did not want to talk about it or about her mother. KT was "very, very fearful" whenever Wilson spoke about Terrell and Florczak, but she did not have the same reaction when Wilson spoke about the Kleins. At the third session, when Wilson presented KT with preschool, anatomically correct drawings of a boy and a girl, KT spontaneously said she "had a bad secret", which was that she and her mother were naked in some photographs. KT told Wilson that "next time I will talk about all the bad secrets about Denise and Tony [Florczak]".

At that next session, while drawing pictures, KT told Wilson she was drawing "mommy's privates" which she had seen "lots of times". KT said "mommy touches my privates and makes me touch her privates . . . she puts her fingers in my privates". KT also indicated that had happened "lots of times". After becoming very upset, running around the room, and hiding under the table, KT said her mother told her she would hurt her pets and kill Joe and Debbie Klein if she told anyone. During that session, KT also drew a picture which she said showed "Tony's private" which she had seen "lots of times". She said Florczak "touches [my] privates a lot and he puts his fingers in [my] private . . . and puts his penis in my private". KT recalled that her mother was present when that happened and took pictures. She also said that Florczak touched her "back private", possibly with some part of a toy or a doll. Wilson testified that after KT revealed that information, the child "immediately was very worried" about the safety of her father and Debbie, and she even worried about Wilson's safety. At the final assessment session, KT said that Terrell often "made [me] touch her butt and private parts with [my] naked private parts and rub herself on me", and Terrell pulled her hair and punched her in the stomach. Wilson concluded that KT had posttraumatic stress syndrome and needed ongoing treatment, which she provided.

In addition, the State questioned Wilson as follows:

Q: . . . Were you, in the evaluation phase, were you apprised of nightmares and things that [KT] was suffering that would relate to your diagnosis?

[Florczak's counsel]: Objection, leading.

THE COURT: Overruled.

A: Yes. In order to substantiate my diagnosis, given what the parents had indicated, Mr. Klein and [his wife], based on that and the checklist, the child had several symptoms of anger, aggression, issues with trust, nightmares, had indicated her sense of betrayal, problems with self-esteem, events that represented incidents of the trauma, irritability, wetting.

Q: And, Ms. Wilson, you did make a clinical diagnosis of [KT]?

A: Yes.

Q: And the basis of that diagnosis being?

A: I took my diagnosis out of the *DSM-3R*,[1] which I indicated before, of posttraumatic stress syndrome. I might explain the diagnosis. That in order to have that diagnosis, a child develops . . . symptoms following distressing events. They experience fear, terror and helplessness. There are psychic-numbing, sleeping problems, aggression, irritability and obsession. [KT] fulfilled in the *DSM-3R* every single category to complete that diagnosis, so that substantiates . . . my impressions of her.

Q: And a child who is suffering from posttraumatic stress disorder [*sic*], is that consistent with a child who has suffered sexual abuse?

A: When we give the child posttraumatic stress, it can be to any traumatic event. It is secondary, in this case, in [KT]'s case, to sexual abuse.

Neither defense counsel objected during that testimony except to challenge a question as leading. Florczak's counsel cross-examined Wilson as follows:

Q: And . . . in your field of sex abuse, [posttraumatic stress syndrome] is the diagnosis that you use essentially?

A: It's one of them. There [are] many, but I think for trauma it is. And I think you're right. I mean it doesn't diagnose sexual abuse. It's secondary to the event of sexual abuse.

Q: Right, it's also secondary to many other stresses?

A: Right, right.

Q: And certainly [KT] had had many stresses that you were aware of?

A: Stresses, but that's different than traumatic events. But, yes, you're right, she's had many stresses.

Q: And as a matter of fact, you were aware of some traumatic events when you began to interview [KT]; you were aware of traumatic events that she had suffered?

A: I don't know what you mean by traumatic events.

---

[1]American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d rev. ed. 1987) (*DSM-3R*).

Q: Well, she had just been removed from her mother; isn't that correct?

A: That could possibly be traumatic, yes, for some children.

Q: And in fact you later learned that she was really close to her mother?

A: Yes.

Terrell's counsel similarly cross-examined Wilson:

Q: Let me put this to you as an expert, a person who has worked with children. If you assume a situation where a child has a loving relationship with her mother and that child is taken away from that mother, would you expect to see the same kind of behaviors, acting-out, et cetera?

A: I would expect to see behaviors definitely. Traumatic, no. To get that diagnosis, no.

In addition, Wilson testified that in her opinion the photograph that the police found of Terrell and KT "was pornographic and exploitive."[2]

Joe Klein testified that Detective Lyon had informed him about the photograph and that CPS had taken KT from Terrell. Klein noticed KT had frequent nightmares and wet her bed "more than a four-year-old child should" when she began living full time at the Kleins' home. He took her to a pediatrician for a general evaluation, which showed nothing unusual.

Dr. Eleanor Graham, a pediatrician with the Sexual Assault Center at Harborview Hospital, also testified. Dr. Graham had given KT a thorough examination which involved much greater detail than a regular pediatric examination. She found that KT's hymen had an irregularity which could have been a normal congenital variation or could have been the result of a healed injury. She also saw a vaginal discharge that was later identified as gardnerella, a bacterial germ found in 30 to 40 percent of sexually active adult women. It is also found in 4.2 percent of girls aged 3 to 10 who were

[2]Terrell's counsel specifically objected to the prosecutor's questions about whether the photograph changed Wilson's expert opinion regarding her diagnosis of KT and her treatment recommendations. He argued that those questions invaded the province of the jury. That objection was overruled. Terrell has not assigned error to that ruling and has made no argument on appeal about Wilson's testimony regarding the photograph.

never sexually abused and in 14.8 percent of girls with a history of sexual abuse. Dr. Graham testified that her findings were consistent with a history of sexual abuse. She also could not rule out the possibility that a penetrating injury to KT's anus had occurred, though there was no tissue injury there. On cross examination, Dr. Graham testified that given the difficulty of diagnosing sexual abuse, a normal exam might also be consistent with sexual abuse.

Terrell denied that she ever put her fingers in KT's vagina or ever had KT touch her vaginal area. She likewise knew of no sexual misconduct toward KT by anyone. However, she admitted she once possessed several nude photographs of KT and a photograph of KT, fully dressed, watching Florczak "mooning" the camera.

The jury found Terrell not guilty of first degree rape but guilty of first degree child molestation and sexual exploitation of a minor. Terrell appeals from the judgment and sentence entered against her.

I

ADMISSIBILITY OF KT's STATEMENTS UNDER ER 803(a)(4)

We first decide whether the trial court erred by admitting KT's out-of-court statements to Wilson under the medical diagnosis and treatment hearsay exception of ER 803(a)(4). Terrell argues that because KT did not understand the medical purpose of her statements to Wilson and did not know about Wilson's role as a treatment provider, KT's statements were not admissible under ER 803(a)(4).[3]

ER 803(a)(4) reads in part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (4) . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general char-

---

[3]The State argues that Terrell may have waived this issue because she did not specifically argue it at trial. Terrell did argue the issue, however, and thus preserved it for appeal.

acter of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

█ Washington courts admit child hearsay statements under ER 803(a)(4) even if the child declarant does not understand that the statements were necessary for medical diagnosis or treatment. However, the courts do so only if corroborating evidence supports the child's statements and it appears unlikely that the child would have fabricated the cause of injury. *In re S.S.*, 61 Wn. App. 488, 503, 814 P.2d 204, *review denied*, 117 Wn.2d 1011 (1991); *State v. Butler*, 53 Wn. App. 214, 222-23, 766 P.2d 505, *review denied*, 112 Wn.2d 1014 (1989); *cf.* 5B Karl B. Tegland, Wash. Prac., *Evidence* § 367(4), at 183 (3d ed. 1989).[4] Thus, in Washington, "it is not per se a requirement that the child victim understand that his or her statement was needed for treatment if the statement has other indicia of reliability." *State v. Ashcraft*, 71 Wn. App. 444, 457, 859 P.2d 60 (1993). Such indicia of reliability also satisfy the test for admitting hearsay testimony when no cross examination is allowed. *Ashcraft*, 71 Wn. App. at 457 n.4 (citing *Idaho v. Wright*, 497 U.S. 805, 817, 111 L. Ed. 2d 638, 110 S. Ct. 3139, 3148 (1990)).[5]

█ *Butler* and its progeny did not restrict the type of evidence that may corroborate child hearsay statements under ER 803(a)(4). However, given the United States Supreme Court's holding in *Wright* (as discussed in detail below), we must conclude that for evidence to adequately assure the

---

[4]Tegland holds the contrary view that if a child cannot appreciate the medical purpose of his or her statement, the "assumed basis for reliability is missing" under ER 803(a)(4).

[5]In addition, when a child is injured by a crime, a trial court may admit the child's hearsay statements purporting to identify the perpetrator even though such statements generally are not admissible under ER 803(a)(4). *Ashcraft*, 71 Wn. App. at 456. The rationale for this rule is that the identity of the abuser is "reasonably pertinent to diagnosis or treatment", ER 803(a)(4), because child abuse can involve psychological as well as physical injury, and there is a risk of further injury if the child and the abuser reside in the same household. *Ashcraft*, 71 Wn. App. at 456-57; *see also Butler*, 53 Wn. App. at 220-21; *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985) ("[s]tatements by a child abuse victim to a physician during an examination that the abuser is a member of the victim's immediate household *are* reasonably pertinent to treatment").

reliability of child hearsay statements under ER 803(a)(4), that evidence must be part of the totality of the circumstances in which the child makes the statements. *See Wright*, 497 U.S. at 820-23. Further, to facilitate appellate review, the trial court should identify on the record the specific evidence — drawn from the totality of the circumstances — on which it relies to determine whether or not the statements were reliable, and therefore admissible.

Here, the trial court did not consider the reliability of KT's out-of-court statements to Wilson.[6] However, the circumstances surrounding those statements are clearly detailed in the record. First, KT's young age indicates that she likely had no reason to fabricate the nature of the abuse, and thus, it is not critical that she understood that her statements to Wilson would facilitate her treatment.[7] *See Ashcraft*, 71 Wn. App. at 457. In addition, as she revealed the abusive incidents to Wilson, KT was very fearful when talking about Terrell and Florczak; she was not fearful when talking about the Kleins; she spontaneously said she had "bad secrets" involving Terrell and Florczak; she became very upset, ran around the room, and hid under a table while discussing the specific incidents of abuse; and she was very worried for the Kleins' and Wilson's safety after she

---

[6]The trial court did not do so because it concluded that ER 803(a)(4) was a firmly rooted hearsay exception and, thus, the evidence admitted under the rule was necessarily reliable. However, as discussed below, we do not believe that ER 803(a)(4) is a firmly rooted hearsay exception when used in the context of child hearsay. The reliability of child hearsay statements therefore must be analyzed before the statements can be admissible under ER 803(a)(4).

[7]While Terrell argues that her custody dispute with Klein was a reason for KT to fabricate her statements to Wilson, Terrell made no showing that 3-year-old KT understood that a custody dispute was ongoing or that she could somehow manipulate the outcome of that dispute. KT previously had stayed with the Kleins for a period of time when Terrell entered an inpatient rehabilitation facility, so living full time with the Kleins would not necessarily lead KT to believe her mother and Klein were vying for custody. Terrell also argues that it is error to presume that a young child is unlikely to fabricate a tale of sexual abuse because that presumption circumvents the *Ryan* factors used to determine the reliability of child hearsay. *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984). That issue is not properly before this court, however, because it was never raised at trial.

reported the abuse. Those behaviors indicate a range of emotions that would be extremely difficult, if not impossible, for a 3-year-old to consciously invent and then convincingly portray. They indicate that KT was genuinely revealing what she believed had happened to her and that her statements were trustworthy. Thus, KT's emotional state and behavior while she made the statements to Wilson sufficiently corroborate those out-of-court statements for admission under ER 803(a)(4).[8]

## II

### RIGHT TO CONFRONTATION

Terrell next argues that her right to confrontation was violated because KT's statements did not fall under a firmly rooted hearsay exception due to Washington's broad treatment of ER 803(a)(4) in the context of child hearsay; the therapeutic circumstances surrounding KT's statements lacked particularized guarantees of trustworthiness under *Wright*; and the Washington Constitution provides greater protection for confrontation rights than the United States Constitution. The State contends there was no confrontation clause violation because ER 803(a)(4) is a firmly rooted hearsay exception despite Washington's treatment of it, and regardless, there is sufficient evidence of particularized guarantees of trustworthiness under *Wright* and the totality of the circumstances. The State also maintains that the Washington Constitution gives no greater grant of protection for the confrontation clause than the federal constitution.

Firmly rooted hearsay exception. The confrontation clause of the sixth amendment to the United States Constitution,

---

[8]This case may present unique circumstances because the evidence corroborating KT's hearsay statements appeared simultaneously with those statements. We do not mean to imply that only evidence produced simultaneously with the child's hearsay statements can serve as corroboration under *Wright*. There may be circumstances that occur within a reasonable time before or after a child makes the statements and which have a reasonable nexus to the statements to sufficiently corroborate the reliability of those statements. The trial court must exercise its discretion when determining the scope of the totality of the circumstances in which the statements were made. *See Wright*, 497 U.S. at 822 (the Court declined to adopt a mechanical test for determining the particularized guarantees of trustworthiness of a hearsay statement).

made applicable to the states by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him". U.S. Const. amend. 6; *Wright*, 497 U.S. at 813. As originally interpreted, the federal confrontation clause required the state to either produce the declarant or show that the declarant was unavailable as a witness. *Wright*, 497 U.S. at 814. If the declarant was unavailable, the state also had to show that the declarant's statements bore adequate indicia of reliability. *Wright*, 497 U.S. at 814-15.

However, the Supreme Court has since held that a declarant's hearsay statement may be admissible even if the declarant is available as a witness but does not testify, as long as the statement's reliability is demonstrated. *White v. Illinois*, 502 U.S. 346, 116 L. Ed. 2d 848, 112 S. Ct. 736, 741-42, 742 n.6 (1992). Consequently, in the context of hearsay statements, the key to determining whether a defendant's right to confrontation was violated under the federal confrontation clause is whether the hearsay statements bore the requisite indicia of reliability. *White*, 112 S. Ct. at 741-43; *Idaho v. Wright*, 497 U.S. 805, 816, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990). That reliability requirement may be satisfied by showing either that the statement falls under a firmly rooted hearsay exception or that the statement is supported by " 'a showing of particularized guarantees of trustworthiness.' " *Wright*, 497 U.S. at 816 (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531, 2539 (1980)).

Terrell acknowledges that ER 803(a)(4) is a firmly rooted hearsay exception. She contends, however, that the way Washington courts apply that exception in the context of child hearsay has stripped the exception of its "firm roots" because the underlying rationale for the exception no longer operates to assure the reliability of the statements.

We agree that in the context of child hearsay, ER 803(a)(4) is not a firmly rooted hearsay exception. Before Washington adopted that evidentiary rule, statements made for the purpose of diagnosis and treatment were not admis-

sible as substantive evidence but only for the limited purpose of supporting the testifying physician's medical conclusions. *See Smith v. Ernst Hardware Co.*, 61 Wn.2d 75, 79, 377 P.2d 258 (1962); 5B Karl B. Tegland, Wash. Prac., *Evidence* § 367(1), at 179 (3d ed. 1989). The rule then made such testimony admissible as substantive evidence to prove the truth of the matter asserted based on the rationale that people seeking medical care would be highly unlikely to lie. *See, e.g., Wright,* 497 U.S. at 820; *Butler,* 53 Wn. App. at 220. It was only recently that the rule was extended in this state to include out-of-court statements to health care professionals from children too young to comprehend the purpose of the statements. *See, e.g., Butler,* 53 Wn. App. at 222-23; *State v. Justiniano,* 48 Wn. App. 572, 740 P.2d 872 (1987).

Nevertheless, in this case the reliability of KT's statements was demonstrated by particular guarantees of trustworthiness. *See Wright,* 497 U.S. at 815 (where the evidence falls within a firmly rooted hearsay exception, reliability can be inferred; otherwise, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness).

■ Particularized guarantees of trustworthiness. According to *Wright,*

> the "particularized guarantees of trustworthiness" required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. . . . Because evidence possessing "particularized guarantees of trustworthiness" must be at least as reliable as evidence admitted under a firmly rooted hearsay exception . . ., we think that evidence admitted under the former requirement must similarly be so trustworthy that adversarial testing would add little to its reliability. . . . Thus, unless an affirmative reason, *arising from the circumstances in which the statement was made,* provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement.
>
> . . . We . . . decline to endorse a mechanical test for determining "particularized guarantees of trustworthiness" under the Clause. Rather, *the unifying principle is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.*

. . . To be admissible under the Confrontation Clause, hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial. . . .

In short, the use of corroborating evidence [other than evidence derived from the totality of the circumstances surrounding the statement] to support a hearsay statement's "particularized guarantees of trustworthiness" would permit admission of a presumptively unreliable statement by bootstrapping on the trustworthiness of other evidence at trial, a result we think at odds with the requirement that hearsay evidence admitted under the Confrontation Clause be so trustworthy that cross-examination of the declarant would be of marginal utility. . . . [W]e think the presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless, rather than that any basis exists for presuming the declarant to be trustworthy.

(Footnote omitted. Italics ours.) 497 U.S. at 820-23.

As previously discussed, the totality of the circumstances surrounding KT's statements to Wilson provides ample assurance that KT was telling the truth when she made those statements. Wilson testified that KT gave no indication that her disclosures had been prompted or "scripted" by anyone, and KT understood the difference between the truth and a lie. Her statements were spontaneous (she disclosed most of the sexual abuse during one session while drawing pictures), and they were not preceded by questioning from Wilson. Wilson also testified that KT's behavior changed markedly when she began to disclose the abuse: she showed a great deal of anxiety, fear, and shame, ran around the room and hid under the table. There also was no reason for KT to fabricate the abuse, and her statements were not the sort that a 3-year-old would be able to invent. *See Wright*, 497 U.S. at 826 (two factors relating to the trustworthiness of a child declarant's statements are whether the child had a motive to lie about the abuse and "whether, given the child's age, the statements are of the type 'that one would expect a child to fabricate.' ") Thus, there were particularized guarantees of trustworthiness supporting KT's statements, and Terrell's right to confrontation under the federal confrontation clause was not violated by the admission of those statements.

State constitution. Terrell also contends that an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986) demonstrates that our state confrontation clause provides greater protection than the confrontation clause in the federal constitution. We disagree. An analysis of the six *Gunwall* factors shows that the protection afforded by both clauses is identical.[9] Terrell's right to confrontation under the federal and state constitutions has not been violated.

## III

### ADMISSION OF WILSON'S DIAGNOSIS

We next determine whether the trial court erred by admitting Wilson's diagnosis that KT had posttraumatic stress syndrome, secondary to sexual abuse. Terrell contends that Wilson's testimony about posttraumatic stress syndrome and behavioral characteristics consistent with child sexual abuse should have been excluded on three grounds: (1) Wilson did not qualify as an expert; (2) the "syndrome" or "profile" testimony Wilson presented lacked a firm scientific basis under *Frye v. United States*, 293 F. 1013, 34 A.L.R. 162 (D.C. Cir. 1923) and is not favored by courts; and (3) Wilson's testimony was an impermissible opinion on Terrell's guilt, thereby invading the province of the jury.

The State argues that Terrell may not raise the issues of Wilson's status as an expert or the scientific reliability of her

---

[9]First, there is no significant difference between the text of the federal confrontation clause and that of the Washington Constitution. The state provision guarantees an accused the right "to meet the witnesses against him face to face". Const. art. 1, § 22 (amend. 10). The federal confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him". U.S. Const. amend. 6. The Supreme Court has stated that the framers of the federal confrontation clause had a "preference for face-to-face accusation". *Wright*, 497 U.S. at 814 (quoting *Roberts*, 448 U.S. at 65). We infer from that "preference" that the interpretation of the federal clause is comparable to an interpretation of our state clause. Likewise, we are not persuaded that Washington's constitutional and common law history or the different structures or functions of the two constitutions justify a conclusion that the state confrontation clause provides greater protection to Washington defendants. Finally, Terrell offers us no basis to conclude that a defendant's confrontation rights generate unique state or local concerns that would not be addressed by the federal clause.

testimony under *Frye* because she failed to raise those issues at trial. It also contends that even if Terrell were not precluded from raising the *Frye* issue, Wilson's testimony was not impermissible "syndrome" or "profile" testimony. Finally, the State argues that Wilson's testimony did not invade the province of the jury, but if there was any such error, it was harmless.

Waiver. The State is correct that neither defense counsel ever objected to Wilson's testimony on the grounds that she was not qualified as an expert or that the *Frye* standards were not met. The only objection defense counsel made to Wilson's testimony was that KT's statements were not admissible under ER 803(a)(4). Counsel never mentioned *Frye* and never challenged Wilson's credentials.[10]

■ Failure to object to the admissibility of evidence at trial precludes appellate review of that issue unless the alleged error involves manifest error affecting a constitutional right. *State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992); *State v. Stevens*, 58 Wn. App. 478, 485-86, 794 P.2d 38, *review denied*, 115 Wn.2d 1025 (1990). Such error is not created by the failure to lay an adequate foundation under *Frye*. For example, in *State v. Jones*, 71 Wn. App. 798, 820, 863 P.2d 85 (1993), the court concluded that the admission of a CPS caseworker's testimony was improper because it included "generalized assertions about common behaviors of sexually abused children" and thus exceeded the limits of the caseworker's personal experience. However, because the defendant failed to specifically object to an inadequate foundation under *Frye* for the caseworker's testimony, the issue was not preserved for review. 71 Wn. App. at 821. Terrell similarly failed to preserve for review any challenge to Wil-

---

[10]While Terrell has not specifically assigned error to Wilson's qualifications as an expert witness, she argues that Wilson was not qualified to give an expert opinion on the behavior of child sexual abuse victims. However, Wilson's graduate education in social work and her years of experience qualify her as an expert in that realm. *See State v. Jones*, 71 Wn. App. 798, 814, 863 P.2d 85 (1993) (a witness with education and experience comparable to Wilson's qualified as an expert).

son's expert status or to the foundation for her testimony regarding posttraumatic stress syndrome.[11]

■ **Invading the province of the jury.** Terrell also argues that Wilson's testimony invaded the province of the jury to weigh the evidence and make credibility determinations. No objection was made at trial to Wilson's diagnosis of KT or her explanation of that diagnosis. However, because a constitutional error is implicated here, the requisite 4-step analysis must be undertaken. *Lynn,* 67 Wn. App. at 345. Thus, the reviewing court

> must first determine whether the error raises a constitutional issue, then determine whether the error is manifest. If the error is manifest, [the court] will address the merits of the issue. Finally, if error was committed, [the court] will apply a harmless error analysis.

*Jones,* 71 Wn. App. at 809.

■ There are three segments of Wilson's testimony pertinent to this issue. First, she stated that "[s]ome of those symptoms [poor impulse control, aggression with toys, sleep problems, distraction, fear, anxiety, stomach aches, and headaches] could be correlated with a child who has been sexually abused." There was no error in admitting that statement "because an observation that a victim exhibits behavior typical of a group does not relate directly to an inference of guilt of the defendant." *Jones,* 71 Wn. App. at 815 & n.6. That observation also is not a conclusion that the child was in fact sexually abused. Thus, there was no invasion of the jury's function, and no further analysis is necessary for that testimony.

---

[11]Even if the *Frye* issue had been preserved for review, it would appear that testimony about posttraumatic stress syndrome (with no accompanying opinion testimony about the direct cause of that syndrome) is distinguishable from testimony about child sexual abuse syndrome. Posttraumatic stress syndrome is a recognized diagnosis listed among the accepted diagnoses of mental disorders in the *DSM-3R,* a well-established and respected professional manual. From Wilson's testimony, we can infer that a diagnosis of posttraumatic stress syndrome indicates that the person suffering from the condition was exposed to a traumatic event, but the diagnosis does not, without more, amount to an opinion about what the trauma was. The jury would rely on evidence of the circumstances leading to the person's condition to make a finding about what the traumatic event was.

Second, Wilson diagnosed KT as having posttraumatic stress syndrome, and she relied on the Kleins' checklist of KT's behavioral symptoms (which "fulfilled in the *DSM-3R* every single category to complete that diagnosis") to substantiate that diagnosis. The posttraumatic stress syndrome diagnosis was not, in itself, testimony about child sexual abuse syndrome or testimony that KT fit a "profile" of a sexually abused child. Wilson emphasized that a diagnosis of posttraumatic stress syndrome did not diagnose sexual abuse and that any number of traumatic events could lead to a diagnosis of posttraumatic stress syndrome. Likewise Wilson never indicated, directly or indirectly, that certain behaviors or behavior patterns demonstrate or substantiate sexual abuse, and thus, her testimony about posttraumatic stress syndrome did not usurp the jury's function of weighing the evidence to decide whether KT was in fact sexually abused. No error resulted from the admission of Wilson's expert testimony that KT suffered from posttraumatic stress syndrome.

However, constitutional error did occur when, after being asked whether a diagnosis of posttraumatic stress syndrome is "consistent with a child who has suffered sexual abuse", Wilson stated, "[w]hen we give the child posttraumatic stress, it can be to any traumatic event. It is secondary, in this case, in [KT]'s case, to sexual abuse." By stating that her diagnosis of posttraumatic stress syndrome was secondary to sexual abuse, Wilson rendered an opinion of ultimate fact — *i.e.*, whether KT had been sexually abused — which was for the jury alone to decide. Because only Terrell and Florczak were implicated as the possible abusers, this segment of Wilson's testimony also amounted to an opinion that they were guilty, either individually or jointly, of sexually abusing KT. Admitting that evidence invaded the province of the jury. *Jones*, 71 Wn. App. at 813. It therefore was manifest constitutional error, that is, error that had "practical and identifiable consequences in the trial of the case." *Lynn*, 67 Wn. App. at 345.

Manifest constitutional error is harmless only if the untainted evidence is so overwhelming that it necessarily supports a guilty verdict. *Jones,* 71 Wn. App. at 813. Here, the untainted evidence includes the following: (1) KT's statements to Wilson detailing the sexual abuse; (2) evidence of KT's display of emotions and behaviors when she disclosed the abuse (*e.g.,* KT seemed very ashamed; she was very frightened and upset, ran around the room, and hid under the table; and she was very worried that the Kleins and Wilson might be in danger because her mother had threatened to kill the Kleins and KT's pets if she told anyone about the sexual activities); (3) Klein's testimony that KT complained occasionally during visitations that her "peepee" hurt and there was a redness in her vaginal area on those occasions; (4) Dr. Graham's testimony indicating that her findings were consistent with a history of sexual abuse; and (5) the photograph showing Terrell and KT exposing their genitalia.

That untainted evidence, taken together, was so overwhelming that even without the erroneously admitted testimony, the jury would have concluded that sexual abuse was the underlying trauma leading to KT's diagnosis of posttraumatic stress syndrome. Thus, the error was harmless. *Jones,* 71 Wn. App. at 813.

The Judgment and Sentence are affirmed.

GROSSE and BECKER, JJ., concur.

Review denied at 126 Wn.2d 1010 (1995).