**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 53343-0-II |
| Respondent, | |
| v. | |
| TOMÁS MANUEL GASPAR, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Tomás Manuel Gaspar was convicted of three counts of fist degree incest, two counts of second degree child rape, and one count of first degree child rape based on sexual abuse of one of his daughters and two of his granddaughters. Each victim testified that he raped her, and the sexual assault nurse who examined them testified regarding their disclosures to her. There was no physical evidence of abuse.

Gaspar appeals, arguing that the nurse improperly testified as to her opinion of Gaspar's guilt, that the prosecutor's statements during closing argument referencing the rules of evidence amounted to misconduct, that he received ineffective assistance of counsel based on his counsel's failure to object, and that cumulative error warrants reversal. He also challenges two conditions of community custody and the imposition of interest on legal financial obligations. The State concedes that the challenged conditions and interest provision were improper.

We affirm Gaspar's convictions. The challenged nurse's testimony was improper but its improper admission was harmless, and the prosecutor's statements were not improper. Gaspar's ineffective assistance of counsel claims also fail. Thus, there are not multiple errors that would

require reversal under the cumulative error doctrine. We accept the State's concessions that the challenged community custody conditions and interest on legal financial obligations were improper, and we remand for correction of these errors.

FACTS

One of Gaspar's daughters, AB, and two of this granddaughters, RS and LS, accused him of sexual abuse. Each of the victims was between 11 and 13 years old when the alleged abuse took place, and they are all around the same age.

AB disclosed the abuse to her counselor after her mother noticed behavioral changes in her, including self-cutting. The abuse at issue took place on occasional weekend visits that AB had with Gaspar after AB's mother had separated from Gaspar. AB was about 12 years old at the time, although she said Gaspar started having sexual contact with her as early as when she was in first grade.

RS and LS disclosed their abuse at the same time to their mother when they were 11 and 13 years old, respectively. Their mother and AB's mother reported the allegations to the police. The State charged Gaspar with three counts of first degree incest, two counts of second degree child rape, and one count of first degree child rape.

At trial, AB testified that Gaspar had sex with her when she was in sixth grade. She said she did not tell her mother because she was scared of what would happen and Gaspar told her not to. He told her that if she told anyone he would go to jail. She testified that he had sex with her multiple times, sometimes in a chair in his room and sometimes in the attic. She testified that Gaspar watched pornographic videos with her and that she and LS had drawn pictures of people having sex with little girls. These pictures were admitted into evidence.

LS and RS both testified that Gaspar tried to put his penis in their vaginas and LS testified that it went partway in. LS testified that Gaspar also touched her vagina using his hands and mouth. LS said that Gaspar watched pornographic videos with her.

Lisa Wahl, a sexual assault nurse examiner, examined all three victims. Wahl was treated as an expert for the purposes of testifying, and Gaspar did not object to her qualifications. She did not act as a forensic interviewer, but rather met with each victim once to take their history, including sexual history, and perform a general physical exam. She then referred them to their regular healthcare providers and mental health counselors for ongoing treatment. Wahl did not serve as an ongoing treatment provider for any of the victims.

Wahl testified generally that delayed disclosure of sexual assault is common, particularly where the abuser is a family member. She then described her examination and interview of AB, during which AB described the abuse. Wahl testified that AB confirmed that her father had abused her, including instances of penile-vaginal penetration, since she was in first grade. Wahl testified that AB confirmed that there was penile-vaginal penetration, and also provided more details of the abuse than AB relayed in her own testimony.

Wahl then generally explained the phenomenon of grooming, where a perpetrator engages with a child over a period of time slowly "breaking down those rules and boundaries that usually exist between an adult and a child," and uses enticements or threats to prevent the child from disclosing. 1 Verbatim Report of Proceedings (VRP) (Mar. 21, 2019) at 201-02. She explained how that behavior manifested itself in this case:

> For [AB], she was told that he'll go to jail. Now, why would that matter to [AB]?
> Well, he's her father and she loves him. And children love their parents, they're
> like right and left arms. You can't sever that relationship; they're the first people
> that a child knows and loves. And to then put that burden of her father will go to

3

jail if she tells shifts the onus of responsibility onto the child's back and off of the perpetrator's back.

And so now we're talking about toxic stress, bearing that burden for six years until she disclosed.

*Id.* at 202-03. Wahl also explained that self-harm is a common coping mechanism of children who have been sexually abused, "[s]o she's going to self-harm is one classic example." *Id.* at 204. Wahl identified cutting as a typical response to molestation or child rape. The State later asked Wahl if she could think of any other reason AB would have cut herself besides the abuse by her father, and Wahl replied that she did not know of another reason. Gaspar did not object to these statements.

Wahl also testified that LS reported penile-anal penetration, as well as penile-vaginal penetration. RS reported penile-vaginal penetration.

One of the investigating detectives testified that he was aware that AB had also accused another relative of sexually abusing her, but the family informed him that the allegation had been resolved several years ago and they did not want him contacted. The detective did not follow up on this allegation. Wahl also testified that she was aware of AB's allegation against the other relative, although AB never told her when this alleged abuse occurred.

During closing argument, the prosecutor explained how AB, RS, and LS were all embarrassed about testifying and reluctant to share much detail about their experiences. He then contrasted their trial testimony with their disclosures to Wahl, explaining that it was easier for them to discuss the abuse alone with a medical professional. In doing so the prosecutor mentioned the hearsay exception for statements made for a medical diagnosis as a way of arguing that such statements can be particularly reliable. Gaspar did not object to these statements.

The prosecutor also referenced the rules of evidence elsewhere in his closing argument, explaining that the trial court sometimes excludes evidence, for example, because it is hearsay.

The prosecutor did so in the context of explaining to the jury that it should focus on the evidence presented as it relates to the elements of the crimes charged. Gaspar did not object to these comments.

The jury found Gaspar guilty on all counts. The trial court sentenced Gaspar to 318 months to life in prison for first degree child rape, as well as community custody for the rest of his life, with his lesser sentences for all of the other counts to run concurrently. One condition of community custody was that Gaspar must undergo "periodic polygraph and/or plethysmograph testing to measure treatment progress and compliance at a frequency determined by [his] Sexual Offender Treatment Provider (SOTP), [community corrections officer], or [Department of Corrections] Policy." Clerk's Papers (CP) at 59. The trial court also ordered that Gaspar not be allowed to access the Internet without supervision and the prior approval of his community corrections officer. The trial court ordered Gaspar to pay only the crime victim assessment and DNA collection fee because he was indigent, but it included the boilerplate language imposing interest on these financial obligations.

Gaspar appeals.

ANALYSIS

I. WAHL'S TESTIMONY

Gaspar argues that his convictions for second degree rape of a child and incest that were based on his abuse of AB must be reversed because Wahl improperly testified as to her opinion of Gaspar's guilt. We hold the challenged testimony was improper and was a manifest error, but the error was harmless beyond a reasonable doubt.

5

A.      RAP 2.5(a)(3)

Gaspar acknowledges that he did not properly object to Wahl's testimony at trial. To bring this claim for the first time on appeal, he must therefore show that allowing this testimony was a manifest error affecting a constitutional right. RAP 2.5(a)(3). "Application of RAP 2.5(a)(3) depends on the answers to two questions: '(1) Has the party claiming error shown the error is truly of a constitutional magnitude, and if so, (2) has the party demonstrated that the error is manifest?'" *State v. Grott*, 195 Wn.2d 256, 267, 458 P.3d 750 (2020) (quoting *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015)).

The focus of the manifest error inquiry "must be on whether the error is so obvious on the record that the error warrants appellate review." *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009). The defendant must make a plausible showing that the asserted error had practical and identifiable consequences at trial. *Grott*, 195 Wn.2d at 269. To make this determination, "'the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.'" *Id.* (quoting *O'Hara*, 167 Wn.2d at 100). In *Grott,* the court concluded that there was "no basis to conclude that the trial court should have sua sponte" corrected the error. *Id.* at 270.

B.      Whether Gaspar Alleges a Manifest Error of Constitutional Magnitude

Gaspar alleges that Wahl's testimony violated his right to a jury trial. An expert's testimony may violate the defendant's constitutional right to a jury trial if it invades the fact-finding province of the jury by expressing an opinion about the guilt or veracity of the defendant or about the veracity of the victim. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). This invasion of the jury's province to find facts is clearly an issue of constitutional magnitude.

Under *Grott*, we next determine whether Gaspar makes a plausible showing that Wahl's testimony had practical and identifiable consequences in his trial. 195 Wn.2d at 269. "It is not enough that the Defendant allege prejudice—actual prejudice must appear in the record." *State v. McFarland*, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995). "Admission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." *Kirkman*, 159 Wn.2d at 936. Rather, because the manifest error exception is narrow, it "requires a nearly explicit statement by the witness that the witness believed the accusing victim" or that the witness believed the defendant was guilty. *Id.*

Gaspar argues that Wahl improperly testified that AB had been abused by Gaspar and that AB's psychological trauma was linked to abuse by Gaspar specifically, as opposed to another accused family member. Wahl first testified generally about how trauma can impact a child's behavior and how it can be linked to sexual abuse. She then described how an abuser might groom a victim for abuse by using enticements or threats and described how this process manifested itself in the victims' allegations. She then explained that AB was told her father would go to jail, and putting that burden on her "shifts the onus of responsibility onto the child's back and off of the perpetrator's back." 1 VRP (Mar. 21, 2019) at 202. Finally, Wahl said specifically about AB: "And so now we're talking about toxic stress, bearing that burden for six years until she disclosed." *Id.*

Wahl went on to explain more generally about the impact of severe stress on a child's brain. She then linked these consequences to AB specifically, stating: "So, as these - over time in this developing brain of a child -- for [AB's] sake, six years -- what has happened to her brain is

7

potentially permanent physiologic as well as psychologic change in these neuropathways." *Id.*at 204.[1]

Finally, Wahl more generally explained that this type of abuse can lead to self-harm and cutting, and, although there might be other reasons a child might cut themselves apart from sexual abuse, Wahl did not know of any other reasons why AB would have cut herself.

Gaspar does not argue that it was improper for Wahl to describe general behaviors of child victims of abuse, but rather that it was improper for Wahl to identify AB as a victim of sexual abuse and Gaspar, her father, as the perpetrator. He likens Wahl's testimony to the testimony in *State v. Florczak*, 76 Wn. App. 55, 882 P.2d 199 (1994). There, an expert witness testified that the victim suffered from posttraumatic stress disorder and "'[w]hen we give the child [posttraumatic] stress, it can be to any traumatic event. It is secondary, in this case, in [the victim]'s case, to sexual abuse.'" *Id.* at 74 (alteration in original) (quoting testimony). Division One held that by stating the victim's posttraumatic stress was linked to abuse, the expert rendered an opinion on the ultimate fact—whether any abuse had occurred. *Id.* The court therefore held that the testimony invaded the province of the jury and constituted a manifest error because it amounted to an opinion that the defendants were guilty. *Id.* Wahl's testimony was similar to the testimony in *Florczak* because she linked AB's symptoms of stress and trauma to her father's threat that if AB disclosed the abuse he would go to jail. This conveyed to the jury that Wahl believed AB and that Gaspar was guilty.

In *State v. Ciskie*, 110 Wn.2d 263, 280, 751 P.2d 1165 (1988), the court allowed general expert testimony on the aspects of posttraumatic stress disorder specifically relevant to survivors

---

[1] Gaspar did not object based on Wahl's credentials or her ability to render an expert opinion on the psychological effects of this stress on AB, nor has this issue been raised on appeal.

of rape because the expert witness stopped short of assessing the victim's credibility regarding whether rape had occurred in that case. Here, Wahl's testimony went beyond what was permissible in *Ciskie* because she linked AB's posttraumatic stress to her relationship with her abuser, and named Gaspar as that abuser. Wahl strayed into telling the jury her diagnosis was based, at least in part, on her belief that AB had been raped.

In *State v. Case*, ___ Wn. App. 2d ___, 466 P.3d 799, 808-09 (2020), we recently applied *Ciskie* and held that general, objective testimony from an expert witness on behaviors typically exhibited by victims did not amount to improper opinion testimony where the expert did not expressly link their testimony to the facts of the particular case. Wahl's testimony violated that principle by linking her general testimony on how perpetrators use grooming techniques such as enticements and threats to what actually happened between AB and Gaspar and by expressly stating that AB's stress was linked to sexual abuse committed by her father.

The State contends that Wahl was merely relaying what AB told her about Gaspar's abuse, rather than expressing her own personal opinion of what happened. The State argues that Wahl was explaining why it would be difficult for someone to disclose abuse by their father, not that Wahl's diagnosis of AB led her to believe that Gaspar was the perpetrator. The State points out that Wahl clarified on cross-examination that AB also talked about being abused by someone other than Gaspar. While this is true, the express connection between AB's symptoms and the rape perpetrated by her father goes beyond what *Ciskie* allowed.

Moreover, *Florczak* established that this type of testimony from an expert constitutes a manifest error affecting a constitutional right under RAP 2.5(a)(3). 76 Wn. App. at 74. In *Florczak,*

the court explained: "By stating that her diagnosis of [posttraumatic] stress syndrome was secondary to sexual abuse, [the expert witness] rendered an opinion of ultimate fact. . . . It therefore was manifest constitutional error, that is, error that had 'practical and identifiable consequences in the trial of the case.'" *Id.* (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)). We therefore conclude that Wahl's testimony connecting grooming activity and AB's symptoms specifically to abuse perpetrated by her father constituted a manifest error affecting a constitutional right.

C.    Harmless Error

The State bears the burden on appeal of showing that this constitutional error was harmless beyond a reasonable doubt. *State v. Franklin*, 180 Wn.2d 371, 382, 325 P.3d 159 (2014); *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). "Manifest constitutional error is harmless only if the untainted evidence is so overwhelming that it necessarily supports a guilty verdict." *Florczak*, 76 Wn. App. at 75.

Gaspar argues that the error was not harmless because AB's account of the abuse at trial was brief and vague, whereas there was some evidence that AB was abused by a different relative. Therefore, Gaspar argues, Wahl's testimony was prejudicial because it bolstered AB's claim while undermining the defense theory that if any abuse occurred, it was not done by Gaspar.

During its closing argument the State emphasized the importance of Wahl's testimony, including portions that we have concluded are improper. In his closing argument, defense counsel pointed to the lack of physical evidence of any abuse and argued that a reasonable doubt existed as to Gaspar's guilt because another family member had been accused of abuse but never investigated. He also highlighted the inconsistencies and lack of detail in AB's trial testimony to

argue that there was a reasonable doubt regarding the timing of the alleged abuse and that penetration occurred.

Although AB did not offer much detail in her trial testimony, she said clearly that her father had sex with her, meaning that his penis went into her vagina, and the last time this occurred was in the summer after her sixth grade year when she was 12. She also testified that he made her watch pornographic movies with him. She indicated that he made her have sex with him in a particular chair in his bedroom. She said that this also occurred in the attic where she sometimes slept. She did not tell anyone because her father said that if she did, he would go to jail.

Gaspar does not dispute that Wahl properly testified about AB's disclosures to her. Wahl relayed to the jury that AB told her that her father sexually abused her starting when she was in the first grade. Wahl reported the details of AB's disclosure of multiple instances of rape. Wahl testified that AB disclosed penile-vaginal penetration and penile-oral penetration, including details about where Gaspar ejaculated. Through Wahl's testimony, the jury was aware that AB had also accused another male relative of sexual abuse. Finally, Wahl's objectionable testimony linking AB's stress to abuse by her father was to some extent cumulative of AB's testimony that she was scared to disclose the abuse because Gaspar told her he would go to jail if she told anybody.

In light of this straightforward and direct testimony that was properly before the jury, as well as the cumulative nature of some of Wahl's objectionable testimony, the straightforward, consistent descriptions from AB and Wahl amounted to overwhelming untainted evidence. The error was therefore harmless beyond a reasonable doubt.

## II. PROSECUTORIAL MISCONDUCT

Gaspar argues that the prosecutor committed misconduct during closing argument by suggesting that (1) there was additional evidence that the rules of evidence prevented the jury from hearing, and (2) statements made to medical providers are more reliable as a matter of law. We disagree.

A.    Background on Prosecutorial Misconduct

To prove prosecutorial misconduct, Gaspar bears the burden to show that the prosecutor's comments were both improper and prejudicial in the context of the entire trial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). Failure to object or to request a curative instruction constitutes a waiver of the misconduct unless the comments were so flagrant and ill intentioned that no jury instruction could have cured the resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *Id.* at 762. Under this heightened standard, a defendant who did not object must show both a substantial likelihood that the misconduct affected the verdict and that such prejudice was not curable. *Id.* at 761.

We review allegedly improper closing arguments "'within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions.'" *State v. Cardenas-Flores*, 194 Wn. App. 496, 515, 374 P.3d 1217 (2016) (quoting *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003)). "[A] prosecutor has wide latitude to argue reasonable inferences from the evidence." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). However, "a prosecutor's argument that shifts the burden to the

defense is improper and amounts to flagrant and ill intentioned misconduct." *Cardenas-Flores*, 194 Wn. App. at 515. "A prosecutor generally cannot comment on the defendant's failure to present evidence because the defendant has no duty to present evidence." *Thorgerson*, 172 Wn.2d at 453. It is also misconduct for a prosecutor to vouch for a witness's credibility. *State v. Robinson*, 189 Wn. App. 877, 892, 359 P.3d 874 (2015).

B.  Whether the Prosecutor Improperly Misstated the Burden of Proof

Gaspar argues that the prosecutor improperly shifted the burden of proof to the defense by suggesting that doubts about the evidence should be resolved in favor of the State. He points to the following portion of the prosecutor's closing argument:

> The State doesn't have to, you know, to prove that someone had red hair, or that, you know, a host of things. It might come up in your head during deliberations and you say, well, why didn't the State prove this? Why didn't the State prove this? Well, there's lots of reasons. Part of it has to do with what evidence is allowed into the case. Some evidence is excluded because of hearsay, which is completely understandable. I mean, when the Court excludes evidence it's all for a good reason. The Court wants the jury to make its decision based upon the facts and the law of the case. The Court doesn't want the jury or the system, and the Court doesn't want the jury to make decisions based outside those elements. So, all the State has to prove is the elements, nothing more.

2 VRP (Mar. 22, 2019) at 249-50. Gaspar did not object to these statements.

In *Thorgerson,* the court disapproved of the prosecutor's reference to the hearsay rules in closing arguments. 172 Wn.2d at 444-45. But the court ultimately held that the reference was not misconduct and instead was a permissible argument on the evidence. *Id.* at 444-45, 453-54. Thus, reference to the rules of evidence in closing argument does not necessarily constitute misconduct. Here, although the prosecutor mentioned the hearsay rules, it is clear from the context of his entire argument that he was not suggesting that the burden of proof rested with Gaspar. Rather, he referenced the evidence rules as an example to argue that the jury should consider only the

13

evidence admitted and focus on the evidence relevant to proving the elements of the crime. Even though it would have been better not to invoke the rules of evidence, the broader argument was a permissible one.

C.     Whether the Prosecutor Improperly Vouched for Wahl's Testimony

Vouching may occur when the prosecutor "'place[s] the prestige of the government behind the witness.'" *Robinson* 189 Wn. App. at 892-93 (quoting *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010)). Shortly after his comments on the hearsay rule discussed above, the prosecutor turned to Wahl's examination of the victims:

> So, you saw their reluctance in this case to talk about it. Well, then you heard from Lisa Wahl. Now, when they talked to Lisa Wahl they were sitting there with, you know, basically one-on-one or they had - I think she had a nurse in there with her as well. But they're sitting and they're comfortable and they're talking, and they're much more likely to disclose at that point. And Lisa Wahl took this information for the purpose of a medical diagnosis. So, what the kids told her, it was very important that it be true and accurate because that's the - for instance, on the hearsay rule, one of the exceptions is that the physician-patient conversation. Since it's - since the statements are made for the purpose of medical diagnosis and treatment people tend to be much more honest when they talk about what happened to them, because it's important that the doctor realize what's going on, to accurately help them. So, people tend to be much more accurate when they talk to a doctor.

2 VRP (Mar. 22, 2019) at 250-51. Gaspar did not object to these statements.

Gaspar argues that these statements vouched for the credibility of the children's disclosure to Wahl and Wahl's testimony about those disclosures because the prosecutor's reference to the rules of evidence "placed upon Wahl's testimony the imprimatur of the judicial system itself." Br. of Appellant at 31. But the prosecutor did not offer his personal opinion of the credibility of these disclosures or suggest that Wahl specifically was a reliable witness by virtue of being a medical professional. Rather, he explained that as a general matter child victims of abuse tend to be more forthcoming with details of their abuse when speaking in private to a medical professional than

they are when testifying at trial, in order to explain the lack of detail elicited from the children on the stand about the abuse they experienced. "Thus, the prosecutor was simply drawing inferences from the evidence at trial, not implying knowledge of facts outside the evidence" or "plac[ing] the prestige of the government behind the witness." *Robinson*, 189 Wn. App. at 894.

Gaspar also reasons that the prosecutor's statements to the jury on the law must be limited to the law as set forth in the trial court's instructions to the jury, *see State v. Perez-Cervantes*, 141 Wn.2d 468, 475, 6 P.3d 1160 (2000), but courts generally do not instruct juries on the rules of evidence because doing so could cause confusion.

As discussed above, although frowned upon, the mere reference to the rules of evidence in closing argument does not necessarily constitute misconduct. *Thorgerson*, 172 Wn.2d at 444-45. Rather, "the more important focus" is whether the prosecutor's comments improperly bolstered the credibility of the disclosures made to Wahl. *Id*. at 445.

In *Thorgerson*, the court disapproved of the prosecutor's references to hearsay rules in his opening and closing statements to explain why a witness did not provide more information, but stated that they did not rise to prosecutorial misconduct because "the prosecutor did not refer to the nature of that testimony or his personal belief" in the substance of that testimony. *Id.* at 444. Rather, the prosecutor was responding to the defendant's attempts to undermine the witness's credibility by highlighting inconsistencies in her testimony. *Id.* at 444-47.

Here, as in *Thorgerson*, the prosecutor did not convey a personal belief in Wahl's testimony, her credibility as a witness, or the victims' allegations. The purpose of his remarks on the evidence rules was to emphasize the significant differences in the environments where the victims had discussed their rapes—in Wahl's office and on the witness stand. In *Thorgerson*, the

prosecutor reasonably sought to mitigate any attempt to undercut the credibility of the victims' trial testimony. *Id.* at 445-46. This is precisely what defense counsel did in closing argument here—he pointed out discrepancies in the victims' accounts of the time frame when the alleged abuse took place and highlighted that each of their testimonies lacked sufficient detail to establish that penetration had taken place. The prosecutor was responding to this attempt to undermine the victims' credibility. For these reasons, we hold that the prosecutor's statements were not improper.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

In the alternative, Gaspar argues he received ineffective assistance counsel based on his counsel's failure to object to Wahl's testimony and to the alleged instances of prosecutorial misconduct. We disagree.

A.    Ineffective Assistance Generally

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To demonstrate that he received ineffective assistance of counsel, Gaspar must show both that defense counsel's performance was deficient and that the deficient performance resulted in prejudice. *State v. Linville*, 191 Wn.2d 513, 524, 423 P.3d 842 (2018). Defense counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). We strongly presume that defense counsel's performance was not deficient. *Emery*, 174 Wn.2d at 755. To overcome this presumption, Gaspar must show "the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." *McFarland*, 127 Wn.2d at 336.

Prejudice ensues if there is a reasonable probability that the result of the proceeding would have been different had defense counsel not performed deficiently. *Estes*, 188 Wn.2d at 458. For a claim based on counsel's failure to object, the defendant "must establish that an objection likely would have been sustained." *In re Det. of Monroe*, 198 Wn. App. 196, 205, 392 P.3d 1088 (2017). Because both prongs of the ineffective assistance of counsel test must be met, the failure to demonstrate either prong will end our inquiry. *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

B.     Failure to Object

Because we hold that Wahl's testimony was improper, we must address whether defense counsel's failure to object amounted to ineffective assistance. For the same reasons that Wahl's testimony was harmless beyond a reasonable doubt, Gaspar has failed to prove prejudice resulted from counsel's failure to object. As discussed above, Wahl's objectionable testimony was to some extent cumulative of AB's testimony that she was scared to disclose the abuse because Gaspar told her he would go to jail if she told anybody. And AB's own testimony conveyed sufficient detail of rape, as did testimony from Wahl that Gaspar does not assert was improper. Although the State relied on Wahl's testimony during closing argument, as discussed above, the purpose of this reference was to emphasize that AB's disclosure to Wahl was consistent with her testimony, not to bolster Wahl's credibility as an expert or to highlight her opinion of the facts of the case. Thus, even assuming defense counsel performed deficiently, Gaspar has not shown that the outcome of his trial would have been different had counsel objected to Wahl's testimony.

Gaspar also alleges ineffective assistance of counsel based on the lack of objection to the alleged instances of prosecutorial misconduct. Because we hold that neither challenged statement was improper, defense counsel was not deficient for failing to object.

## IV. CUMULATIVE ERROR

Gaspar argues that cumulative error deprived him of a fair trial. "Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [their] right to a fair trial, even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). "The doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." *Id.* Because Gaspar has not identified multiple errors, the doctrine does not apply here.

## V. CONDITIONS OF COMMUNITY CUSTODY

Gaspar argues the trial court erred in ordering him to submit to penile plethysmograph testing at the discretion of the department and in restricting his Internet use. The State concedes that both of these conditions were improperly imposed. We agree.

First, Gaspar argues the trial court erred in ordering penile plethysmograph testing as directed by his community corrections officer and department policy. He requests that this condition be modified to clarify that such testing can only occur for purposes of his sexual deviancy treatment, as directed by his treatment provider. The State concedes that the condition is improper as written and should be modified as Gaspar suggests.

The trial court may order plethysmograph testing as a part of crime-related treatment. *State v. Johnson,* 184 Wn. App. 777, 780, 340 P.3d 230 (2014). However, using plethysmograph testing as a monitoring tool at the discretion of the community corrections officer or department policy is

improper. *Id.* at 780-81. We accordingly accept the State's concession and remand for the trial court to clarify this community custody condition.

Second, Gaspar argues that the community custody condition restricting his Internet use is improper because it is not crime-related. The trial court prohibited Gaspar from accessing the Internet "without the presence of a responsible adult who is aware of the conviction, and the activity has been approved by the [community corrections officer] and the Sexual Offender Treatment Provider in advance." CP at 59. Gaspar argues, and the State agrees, that this condition is not crime-related because there is no evidence that Internet use played a role in the commission of his crimes.

The trial court may impose crime-related conditions on a defendant's sentence and term of community custody. RCW 9.94A.505(9), .703(3)(f). "Crime-related" refers to conduct that "directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10). "'Directly related' includes conditions that are 'reasonably related' to the crime." *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015) (quoting *State v. Kinzle*, 181 Wn. App. 774, 785, 326 P.3d 870 (2014)).

"[A] sentencing court may not prohibit a defendant from using the Internet if his or her crime lacks a nexus to Internet use." *State v. Johnson,* 180 Wn. App. 318, 330, 327 P.3d 704 (2014). Here, there was evidence that Gaspar watched pornographic videos with the victims. However, it appears that those videos were watched on DVD or videotape and there was no evidence that Gaspar used the Internet to expose his victims to pornography. We therefore accept the State's concession, hold that this condition was not crime-related, and remand for the trial court to strike this condition.

19

No. 53343-0-II

## VI. LEGAL FINANCIAL OBLIGATIONS

Gaspar argues the trial court erred in ordering that interest accrue on his nonrestitution legal financial obligations because this provision violates RCW 10.82.090(1). The State concedes the trial court should not have imposed interest accrual. We agree and remand for the trial court to strike this provision from Gaspar's judgment and sentence and replace it with updated language that complies with amended RCW 10.82.090(1).

## CONCLUSION

We affirm Gaspar's convictions and remand for the trial court to correct the errors in his judgment and sentence pertaining to Gaspar's community custody conditions and legal financial obligations.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Lee, C.J.

Cruser, J.

20