# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

KEVIN SCOTT THOMAS,

Appellant.

No. 80042-6-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, C.J. — Based on evidence that he sexually assaulted his biological daughter, a jury convicted Kevin Thomas of rape of a child and incest. Thomas challenges several evidentiary rulings and the supervision fee imposed as a condition of community custody. We affirm Thomas's convictions but remand for the court to strike the provision requiring him to pay supervision fees.

FACTS

Kevin Thomas and Jasmine Bolzell are the parents of three children, including a daughter, M.T. During Thomas and Bolzell's 13-year marriage, the family moved frequently—at least 10 times after M.T. was born. When the couple separated in

Citations and pin cites are based on the Westlaw online version of the cited material.

August 2013, they were living in a house on Section Street in Mt. Vernon that the family referred to as the "Section Street" house, or because they owned chickens when they lived there, the "chicken house."

In the two years that followed the parents' separation, the family had numerous different living arrangements. The children initially lived with Bolzell, but later lived primarily with Thomas at several locations, including a trailer parked on a friend's Oak Harbor property, the rural home of a girlfriend, a homeless shelter, and housing in Everett provided by the Veteran's Administration. By November 2015, Bolzell had remarried and the children returned to live with her full-time in Marysville.

Approximately a year-and-a-half later, after someone spoke to her class at school about sexual abuse, M.T. told her older brother that Thomas had raped her. M.T. was "in tears" and trembling, and appeared to be frightened and upset. Bolzell learned about M.T.'s allegations that same day and called the police. A Mt. Vernon police officer arranged for a professional interviewer at the Skagit County Child Advocacy Center to interview M.T. and attended the interview. A pediatric nurse practitioner also conducted a non-acute medical examination of M.T. that included a genital examination.

Based on M.T.'s disclosures, the State charged Thomas with two counts of first degree rape of child and two counts of incest and designated all counts as domestic violence offenses.

At trial, M.T. described two sexual assaults that occurred during the summer that her parents separated when she was approximately eight years old and the family lived at the Section Street house. She said that on one occasion, Thomas told her mother he

wanted to cuddle with her, and after her mother left to go shopping, she went into Thomas's room. After they cuddled for a few minutes, Thomas grabbed her hands. M.T. said that Thomas pulled off her pants and put his penis inside her vagina, while restraining her arms and legs. She told him to stop. Afterwards, M.T. went to another room to play with dolls to "distract herself."

M.T. described another assault that happened during the same summer. M.T. testified that she was watching television in the living room and Thomas took her by the hand and led her to his bedroom. M.T. said that Thomas faced her toward the bed and held her wrists behind her back. She said that Thomas pulled her pants down and put his penis in her vagina. M.T. testified that she felt afraid and experienced pain in her wrists and vagina. After Thomas stopped, M.T. said she again went to play with dolls.

When cross-examined about some of her prior statements, M.T. said that Thomas sexually abused her from the time she was around four years old, until she was eight or nine years old. She recalled that the abuse happened in many locations, including the Section Street house, "the house next to my mom's house, the Everett house, Amanda's home, the homeless shelter, basically everywhere." M.T. said that Thomas told her that if she told anyone, people would not believe her and would stop loving her. She explained that she did not realize that what was happening was wrong when she was younger because it had been happening for so long and she "just thought it was a normal thing."

In addition to M.T.'s testimony, the State presented the testimony of Bolzell, M.T.'s older brother, the child forensic interviewer, the nurse practitioner, the

3

investigating police officer, and the therapist that M.T. began to see after she disclosed abuse.

The State also presented the testimony of two individuals who came into contact with Thomas in jail. Ryan Keith testified that when he shared a cell with Thomas, he heard Thomas rate his daughter's level of sexual attractiveness as a "7 or 8" and describe her relative breast size. Keith was able to describe M.T.'s physical appearance, although he had never met her. Matthew Shope testified that Thomas told him that he assaulted his daughter. Shope said that Thomas explained that he ensured M.T.'s silence by buying her makeup and he was convinced that he would be acquitted because the investigation was limited to vaginal intercourse and did not encompass anal intercourse. The State reduced Shope's charges in exchange for his cooperation in Thomas's case.

The primary themes of Thomas's defense were that M.T. was unable to distinguish between dreams and reality and that her allegations arose from an "overriding theme of abandonment." The defense also claimed that there was a lack of corroborating evidence and that M.T.'s outward behavior toward Thomas was incongruous, in view of her allegations.

The jury convicted Thomas as charged. Thomas appeals.

ANALYSIS

Extrinsic Impeachment Evidence

M.T. told Courtney Long, the child forensic interviewer, that she could only remember two incidents of abuse, both of which occurred at the Section Street house in Mt. Vernon. M.T. provided minimal details to Long, explaining that she tried to "block"

the memories. In two pretrial interviews with defense counsel, M.T. mentioned previously undisclosed acts of abuse, including one that happened when she was four or five years old and another that took place in Everett. M.T. also reported a sexual assault that happened in her bedroom and said that a conversation with her mother about sex triggered her memory of that incident. M.T. was not clear about the exact timing or location of the incident, but said she was older than five. M.T. also said her mother entered her bedroom while the abuse was happening, found Thomas in her bed, and Thomas explained to her mother that they were playing a game.

Prior to M.T.'s testimony, counsel argued that the defense should be allowed to (1) ask M.T. about the uncharged acts of abuse she described in the interviews and (2) impeach M.T.'s testimony about those incidents by eliciting testimony from Bolzell. By means of an offer of proof, the defense established that Bolzell would deny having a conversation about sex like the one M.T. described and did not recall ever discovering Thomas in M.T.'s bed, claiming to be playing a game. The court ruled that the defense could question M.T. about her recollections and any prior statements, but would not be permitted to impeach her testimony with extrinsic evidence.

Thomas challenges the trial court's ruling. He argues that Bolzell's proposed impeachment testimony was highly relevant because M.T.'s perception, credibility, and the accuracy of her timeframe were central issues in the case. He contends that the evidence was admissible under the Rules of Evidence and the court's ruling deprived him of his constitutional right to present a defense.

Criminal defendants have a constitutional right to confront and cross-examine adverse witnesses and to present their defense. U.S. CONST., amends. V, VI, XIV;

WASH. CONST. art. I, §§ 3, 22; Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1005, 39 L. Ed. 2d 347 (1974). We review constitutional challenges to evidentiary rulings utilizing a two-step process. State v. Arndt, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019); State v. Clark, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017). We first review the evidentiary ruling under an abuse of discretion standard. Arndt, 194 Wn.2d at 797-98; Clark, 187 Wn.2d at 648-49. We then review the constitutional question. Arndt, 194 Wn.2d at 797-98; Clark, 187 Wn.2d at 648-49. "If the court excluded relevant defense evidence, we determine as a matter of law whether the exclusion violated the constitutional right to present a defense." Clark, 187 Wn.2d at 648-49.

A trial court abuses its discretion when its decision is based on untenable grounds, an erroneous view of the law, or if it is manifestly unreasonable. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008). We defer to the trial court's evidentiary rulings unless "'no reasonable person would take the view adopted by the trial court.'" Clark, 187 Wn.2d at 648 (internal quotation marks omitted) (quoting State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Bolzell's testimony contradicting details M.T. provided about an uncharged act of abuse was minimally relevant. But despite relevancy, evidence that is prohibited by other rules is inadmissible. ER 402.

The applicable rule is ER 608(b), which provides that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . .

. may not be proved by extrinsic evidence." In some circumstances, and at the discretion of the court, such incidents may be inquired into on cross-examination of the witness. ER 608(b). Thomas cross-examined M.T. about several statements she made in prior interviews with Long and defense counsel. Although he was not precluded from doing so, he declined to cross-examine her about the alleged game-playing incident or the conversation that reportedly triggered her memory.

Thomas points out that ER 608 does not prevent witnesses from contradicting each other and maintains that Bolzell's testimony cannot be characterized as extrinsic because it went to the "complainant's very account that makes up the [S]tate's charges." But, in fact, witnesses cannot be impeached on matters collateral to the principal issues being tried. See State v. Oswalt, 62 Wn.2d 118, 120, 381 P.2d 617 (1963). The only basis for the charges were two sexual assaults that M.T. described that took place in the Section Street house during the summer of 2013. In this context, "extrinsic evidence" means evidence "adduced by means other than cross examination of the witness." BLACK'S LAW DICTIONARY 700 (11th ed. 2019). Because Thomas sought to introduce Bolzell's testimony in order to challenge M.T.'s testimony about an uncharged crime, the evidence was extrinsic and the court's ruling was appropriate under ER 608.

Criminal defendants have a constitutional right to present a defense. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, §§ 3, 22; Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). A defendant's right to present a defense is

subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302; State v. Cayetano-Jaimes, 190 Wn. App. 286, 296, 359 P.3d 919 (2015).

Courts must balance a defendant's need for the evidence in question with the state's interest in excluding it. Arndt, 194 Wn.2d at 812. Under certain circumstances where the evidence is of high probative value, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment" and our state constitution. State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983). For instance, a trial court may violate a defendant's right to present a defense if it refuses to admit evidence that represents the defendant's "entire defense." State v. Jones, 168 Wn.2d 713, 724, 230 P.3d 576 (2010) (exclusion of evidence relating to rape victim's consent).

The court's ruling did not prevent Thomas from presenting a defense. The excluded evidence would not have disproved any of the charges against Thomas. It would have helped the jury only to assess M.T.'s credibility and her perception of an incident that did not form the basis for the charges. This is not the type of highly probative evidence that the court has no discretion to exclude. See Jones, 168 Wn.2d at 721. The excluded impeachment testimony was not Thomas's entire defense. He was able to challenge M.T.'s credibility and her memory through other testimony. For example, he elicited testimony from Bolzell that contradicted M.T.'s version of one of the charged incidents. And Thomas questioned M.T. about her prior statement that the only incident that happened in Mt. Vernon took place when she was four or five years old.

He also elicited testimony indicating that M.T. exhibited no reluctance to visit with Thomas after the alleged abuse occurred.

The exclusion of extrinsic impeachment evidence did not preclude Thomas's defense. The trial court neither abused its discretion nor violated Thomas's right to present a defense.

Admission of Hearsay Evidence

Bolzell testified that because M.T. began to struggle and withdraw after disclosing the abuse, she began to see a therapist. The prosecutor asked whether there were specific "issues of concern" at school, and Bolzell testified that she received a telephone call from a school counselor. Defense counsel objected on the ground that any information provided by the school counselor was inadmissible hearsay. The prosecutor stated that the proposed testimony was offered to show that M.T. had "serious issues" following the disclosure. The court overruled the objection. Bolzell testified that the school counselor informed her that M.T. had reportedly told a friend that she had suicidal feelings.

Thomas claims that the court abused its discretion by admitting Bolzell's hearsay testimony. He contends that there is a reasonable probability that admission of the evidence affected the outcome of the trial because the evidence served to evoke sympathy for M.T. and supported her allegations of assault.

Hearsay is any out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). Evidence constituting hearsay is not admissible at trial unless an exception applies. ER 802. The State contends that it the offered the evidence only to show the school had concerns about M.T., not for the truth of the matter asserted. But

even assuming that the court abused its discretion in admitting the evidence, any error was harmless.

An evidentiary error that does not result in prejudice is not grounds for reversal. State v. Thomas, 150 Wn.2d 821, 871, 83 P.3d 970 (2004). "'The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" Thomas, 150 Wn.2d at 871 (quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). In other words, an evidentiary error "is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Neal, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

Although Thomas argues otherwise, M.T.'s testimony was clear and unequivocal about the rapes that formed the basis for the charges. There was ample admissible evidence, apart from the hearsay reported by Bolzell, that disclosure of abuse was emotionally traumatic for M.T., she struggled in the wake of that disclosure, and began seeing a therapist to help manage her feelings of sadness and anger. Bolzell did not elaborate on the report from M.T.'s school. Her testimony included no inflammatory or dramatic details. There is no reasonable probability that exclusion of the brief and isolated testimony would have changed the outcome of the trial.

Therapist's Testimony

Thomas contends that the testimony of Jamie Fredeen, M.T.'s therapist, violated his constitutional right to a jury trial by invading the fact-finding province of the jury. See State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

Fredeen testified that she had been providing mental health therapy to M.T. for more than a year and a half. Without objection, Fredeen described her background and credentials. She testified that she was employed as a mental health therapist under the auspices of a Child Advocacy Program and provided therapy to "adolescents, young adults, and their families that are coping with sexual abuse." She discussed her training in "trauma-focused cognitive behavioral therapy" specific to sexual abuse. Fredeen testified that she had diagnosed M.T. with posttraumatic stress disorder and major depressive disorder and agreed that those diagnoses were "related" to the issues which led M.T. to require therapy.

Thomas does not contend that it was improper for Fredeen to testify about M.T.'s diagnoses and symptoms, because her perceptions, memories, and ability to recall details and events were "very much in dispute." However, he claims that, like the social worker's improper testimony in State v. Florczak, 76 Wn. App. 55, 74, 882 P.2d 199 (1994), Fredeen's testimony was an "explicit statement that M.T. had indeed been sexually abused." We assume, without deciding, that Thomas properly preserved this claim of error by objecting to aspects of Fredeen's testimony.

In Florczak, law enforcement initiated an investigation after finding the defendants in possession of a sexually explicit nude photograph of the victim, three-year-old K.T. Florczak, 76 Wn. App. at 58. Police officers referred K.T. for an assessment at a sexual assault center for children for "an opinion about whether the photograph caused any injury to K.T. and whether any other abuse had occurred." Florczak, 76 Wn. App. at 59. The social worker who performed the assessment later

11

testified that K.T.'s diagnosis of posttraumatic stress disorder was "secondary" to sexual abuse. Florczak, 76 Wn. App. at 62.

There are critical contextual distinctions between M.T.'s therapist's testimony and the testimony at issue in Florczak. In Florczak, the victim did not testify at trial. The social worker's testimony was an improper opinion on her veracity and the defendants' guilt because it necessarily implied that the social worker evaluated the child's disclosures and found them sufficiently reliable to conclude that sexual abuse had occurred.

Here, Fredeen did not interview or assess M.T. for the purpose of determining whether sexual abuse had occurred. Fredeen explained that the purpose of her work with M.T. was therapeutic and directed toward strengthening her "coping skills and strategies." Fredeen said that while M.T. made disclosures to her in the course of therapy, disclosure itself was not the "point." According to Fredeen, the focus of therapy was to help M.T. to manage her difficult feelings and symptoms by exploring different techniques. In context, Fredeen's testimony about providing therapy for adolescents and families "coping with abuse," was not a judgment of veracity or guilt. Fredeen did not suggest that she made an independent assessment as to the veracity of any facts M.T. disclosed to her.

And in contrast to the very young victim in Florczak, M.T. was approximately 12 years old when she began seeing the therapist and 15 years old when she testified at trial. Jurors had the opportunity to assess her credibility for themselves.

Fredeen's testimony made it clear that her role as a treatment provider was not to determine whether actual abuse occurred, but was only to address the emotional and

psychological issues M.T. was experiencing. She did not state or imply that she believed Thomas to be guilty or comment on M.T.'s veracity. As such, her testimony was not improper opinion testimony.

Suppression of Jailhouse Informant Testimony

Thomas challenges the trial court's denial of his motion to exclude the testimony of Keith, one of the jailhouse informant witnesses.

Thomas's motion was based on the following facts. Attorney Robert Roth represented Thomas from the time of his arrest in August 2017 until April 24, 2018. Approximately two months after he withdrew from Thomas's case, Roth began representing Keith in an unrelated criminal matter. Keith was arrested some months later and came into contact with Thomas in jail. Keith spoke to law enforcement, apparently without counsel, about Thomas's alleged remarks in November 2018, and in January 2019, Roth withdrew from Keith's case. The State conceded below that Keith told Roth about the incident and Roth referred Keith to law enforcement. The court denied the motion to exclude Keith's testimony, concluding that while there may have been grounds to disqualify Roth from acting as Keith's attorney, there was no basis to suppress Keith's testimony.

Thomas argues that the court's ruling deprived him of the right to conflict-free counsel. In all criminal cases, the Sixth Amendment to the United States Constitution gives defendants "the right . . . to have the assistance of counsel for his defense." U.S. CONST. amend. VI. This includes the right to an attorney who is free from any conflict of interest. State v. Dhaliwal, 150 Wn.2d 559, 566, 79 P.3d 432 (2003). An actual conflict of interest is "'a conflict that affected counsel's performance—as opposed to a mere

13

theoretical division of loyalties.'" Dhaliwal, 150 Wn.2d at 570 (quoting Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)). The actual conflict must be readily apparent. Dhaliwal, 113 Wn. App. at 237. For example, an actual conflict of interest exist when an attorney owes a duty of loyalty to clients whose "interests diverge with respect to a material factual or legal issue or to a course of action'" or "'where counsel must slight the defense of one defendant to protect another.'" Dhaliwal, 113 Wn. App. at 237 (quoting State v. Robinson, 79 Wn. App. 386, 394, 902 P.2d 652 (1995)). Whether the circumstances demonstrate a conflict under ethical rules is a question of law which this court reviews de novo. State v. Regan, 143 Wn. App. 419, 428, 177 P.3d 783 (2008).

Thomas claims that Roth engaged in impermissible "side-switching" when he represented Keith and the State benefitted from that conflict when it presented Keith's incriminating testimony. Although he does not rely on the Rules of Professional Conduct (RPC) in his appellate briefing, Thomas appears to maintain that Roth owed him a duty of loyalty which prevented him from representing a person in a separate matter who was later identified as a State witness in his case.

But the record does not establish that Roth violated any ethical responsibility under RPC 1.9 to Thomas, his former client, by representing Keith. See RPC 1.9 (a lawyer shall not represent another person in the "same or a substantially related matter" whose interests are "materially adverse" to the former client, without the consent of the former client). Roth did not represent Thomas and Keith in the same or a substantially related matter and it does not appear that Keith had an actual interest in the proceedings against Thomas. There is no evidence that Keith obtained a benefit in the

14

form or a plea deal or reduction in charges in exchange for the information he reported to law enforcement.  And as the State points out, there is no evidence to suggest that Keith's involvement in his case was the result of or associated with any information Roth learned in representing Thomas or any improper disclosure of confidential client information.  See RPC 1.9(c)(1)(2) (except as provided for elsewhere in the rules, a lawyer who formerly represented a client may not "use information relating to the representation to the disadvantage of the former client" and may not "reveal information relating to the representation.")

No legal authority supports Thomas's claim of an actual conflict of interest that compromised his legal representation or his argument that suppression of relevant witness testimony was warranted.  The cases he cites involve conflicts that arise, for instance, when a prosecutor has "previously personally represented or been consulted professionally by an accused with respect to the offense charged" or closely related matters.  See State v. Stenger, 111 Wn.2d 516, 520, 760 P.2d 357 (1998).  He also cites cases involving conflicts arising from joint representation.  For instance, an actual conflict existed where defense counsel's representation of the defendant and another individual who was a prior target of prosecution caused a "lapse in representation contrary to the defendant's interests" when the attorney failed to call a witness that could have provided potentially useful testimony.  See Robinson, 79 Wn. App. at 399 (quoting Sullivan v. Cuyler, 723 F.2d 1077 at 1086 (3d Cir. 1983)).  There are no analogous circumstances here giving rise to an actual conflict.

Thomas was not deprived of his constitutional right to conflict-free counsel.  The trial court did not err in denying his motion to exclude Keith's testimony.

Cumulative Error

Even if no particular error warrants reversal on its own, Thomas argues that the cumulative effect of the court's errors merits reversal. But, as here, when a party fails to demonstrate any prejudicial error, we will not reverse a conviction. State v. Stevens, 58 Wn. App. 478, 498, 794 P.2d 38 (1990). Because Thomas established no errors, the cumulative error doctrine does not apply.

DOC Supervision Fee

Finally, Thomas challenges the imposition of community custody supervision fees as a part of his judgment and sentence.

Community custody supervision fees are authorized under RCW 9.94A.703(2)(d), which states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the [Department of Corrections]." Because the sentencing court can waive these fees, they are discretionary Legal Financial Obligations (LFOs). See State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199 (2020), review denied, 195 Wn.2d 1022 (2020); State v. Lundstrom, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018), review denied, 193 Wn.2d 1007 (2019).

With regard to LFOs, the sentencing court stated, "I'm assuming that the parties deem Mr. Thomas to be indigent and incapable of paying fines at this time, and I am not going to be imposing any fines upon Mr. Thomas." In response to defense counsel's inquiry, the court clarified that it would waive the criminal filing fee and jury demand fee. Consistent with this ruling, the LFO portion of the judgment and sentence includes only a mandatory victim penalty assessment and strikes the typed dollar amounts listed next

16

to the criminal filing fee and jury demand fee. Nevertheless, the court did not strike the provision imposing community custody supervision fees in the preceding section of the judgment and sentence that was included in a preprinted lengthy list of community custody conditions.

The State points out that Thomas failed to object to the imposition of supervision fees and urges us to decline to address the issue on this basis. But conditions of community custody may be challenged for the first time on appeal. State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019). And Thomas's failure to object was understandable after the court stated that, based on his indigence, it would impose no nonmandatory fines and the State failed to request the imposition of supervision fees.

Because the record reflects Thomas's indigency and the court's intent to waive all nonmandatory LFOs, we remand for the trial court to strike the provision imposing supervision fees. See Dillon, 12 Wn. App. 2d at 152.

We affirm Thomas's convictions, but remand with directions to strike the provision requiring him to pay supervision fees.

_Mann, C.J._

WE CONCUR:

_Chun, J._          _Andrus, A.C.J._